IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CHRISTINA CHENNAULT,           )
    Plaintiff,                 )
                               )
    v.                         )     CIVIL NO. 3:12cv514
                               )
MICHELLE B. MITCHELL, *et al.*, )
    Defendants.                )
_____)

## REPORT AND RECOMMENDATION

Plaintiff Christina Chennault ("Plaintiff") brings this suit as the guardian and personal representative for Lajune S. Brunson ("Brunson") under 42 U.S.C. § 1983 against Defendants Michelle B. Mitchell ("Mitchell"), former Sheriff for the City of Richmond; Gary L. Sink ("Sink"), a former Captain in the Sheriff's Department for the City of Richmond; and Andrew A. Barnhouse ("Barnhouse"), a former Sergeant in the Sheriff's Department for the City of Richmond (collectively "Defendants") for allegedly violating Brunson's Fourteenth Amendment rights. Plaintiff contends that Defendants demonstrated a deliberate indifference towards Brunson's medical needs while she was detained before trial. During that time, a highly intoxicated Brunson attempted suicide and suffered traumatic permanent brain damage.

The matter is now before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the Defendants' Motion to Dismiss. (ECF No. 3.) For the reasons set forth herein, it is the Court's recommendation that the Defendants' motion to dismiss be GRANTED and the case be DISMISSED with prejudice.

.

# I. BACKGROUND

The Court construes the allegations in favor of the non-moving party, as required when resolving a motion for judgment on the pleadings. Fed. R. Civ. P. 12(c); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 591 (4th Cir. 2004) (citations omitted). Viewing the facts through such a lens, the Court has concluded that the facts are as follows.

On July 21, 2004, officers from the City of Richmond Police Department arrested Brunson after receiving a call from her children's father indicating that she had ingested cocaine. (Compl. at ¶¶ 10, 12.) The officers responded to her residence and observed Brunson holding a glass crack pipe. (Compl. at ¶ 11.) When the officers asked Brunson if she had any drugs on her person, she removed one piece of rock cocaine from her mouth and then chewed and swallowed another piece. (Compl. at ¶ 11.) Upon witnessing this incident, the officers arrested Brunson and transported her to the Richmond City Jail Annex ("Jail Annex"). (Compl. at ¶ 12.)

Brunson arrived at the Jail Annex at approximately 11:57 a.m. and was placed in the custody of Defendant Mitchell (the Sheriff for the City of Richmond) and her employees. (Compl. at ¶ 12.) EMS personnel attempted to examine Brunson at that time, but she refused. (Compl. at ¶ 16.) Deputy Catherine Stith ("Stith") then attempted to search Brunson and remove her wig as part of the search. (Compl. at ¶ 18.) Stith explained to Brunson that she would not be able to wear the wig while in custody. (Compl. at ¶ 18.) This upset Brunson and led her to attack Stith by grabbing the wig and pushing Stith against the wall. (Compl. at ¶ 18.) When Stith called for assistance, Deputy James Williams ("Williams") responded by placing Brunson in an arm bar against the wall. (Compl. at ¶ 18-19.) Deputies Daniel Felthoff ("Felthoff") and Anthony Salveggio ("Salveggio") eventually removed Brunson from the room and handcuffed her. (Compl. at ¶ 19.) Defendant Barnhouse, Defendant Sink and Felthoff then transferred

2

Brunson from the Jail Annex to B-block cell number 10, where Brunson "continued to resist and was combative" towards jail employees. (Compl. at ¶ 20.)

Once in the cell, Brunson resisted when Defendant Barnhouse and Felthoff ordered her to lie face down on the bunk and she refused to comply with Defendant Barnhouse's order to loosen her arms so that the handcuffs could be removed. (Compl. at ¶ 21.) In an effort to gain her compliance, Defendant Barnhouse and Felthoff held her down on the bunk while Defendant Sink administered a one-second dose of Oleoresin Capsicum ("O.C.") spray to Brunson. (Compl. at ¶ 23.) Brunson then cooperated, allowing the officers to remove the handcuffs. (Compl. at ¶ 23.) The officers left the cell without decontaminating her from the O.C. spray. (Compl. at ¶ 23.)

Around 12:28 p.m. on that day, inmate trustee Monta Gray alerted Williams and Salveggio that Brunson had attempted suicide by hanging herself in her cell. (Compl. at ¶ 25.) In response, Williams and Salveggio informed the other deputies before running to Brunson's cell. (Compl. at ¶ 25.) Jail employees — including Williams, Salveggio, Felthoff, Stith, Defendant Barnhouse and Defendant Sink — arrived at Brunson's cell to find her hanging from the bars with her neck tied by her shirt to the bars. (Compl. at ¶ 26.) Felthoff unlocked the cell doors and cut Brunson's shirt, so she would fall from the bars. (Compl. at ¶ 26.) However, the officers failed to support Brunson's head or body, causing her to slide down the bars and hit her head. (Compl. at ¶ 26.) They pulled Brunson from the cell, called 911 and Defendant Sink and Felthoff administered rescue breathing until EMS arrived around 12:34 p.m. (Compl. at ¶¶ 27–28.)

When EMS arrived, they restrained Brunson and transferred her to VCU/MCV. (Compl. at ¶ 28.) She remained hospitalized for the next five months with permanent traumatic brain

3

damage that left her unable to communicate or understand her surroundings and reduced to a "permanent, persistent vegetative state" while incurring high medical expenses. (Compl. at ¶¶ 30–31.) Brunson is currently confined to a nursing home bed. (Compl. at ¶ 30.)

Defendant Mitchell was Sheriff for the City of Richmond at the time of Brunson's arrest. (Compl. at ¶ 29.) Plaintiff alleges that the protocol at the Jail Annex required the transporting officer to ask an arrestee five questions upon arrival to determine if the arrestee suffers from any "observable medical and/or mental health problems, any symptoms of suicidal behavior, any escape potential or violent propensity behavior, and any other relevant information." (Compl. at ¶ 13.) Under the City of Richmond Sheriff's Office Policies and Procedures, one answer in the affirmative to any of these questions alerts the booking or intake appointee to the possibility that the arrestee poses a potential security threat or mental/physical health problem and requires immediate action, including alerting the medical department and keeping the arrestee in special housing. (Compl. at ¶¶ 14-15.) Such special housing for arrestees with suicidal tendencies sometimes requires the removal of blankets, sheets, towels, socks, etc. from the cell. (Compl. at ¶ 15.)

Initial booking procedures, pursuant to the jail's Mental Health/Suicide Prevent Policy, also require that the medical staff screen arrestees for suicidal tendencies and put the inmate on one-on-one suicide watch if such tendencies are indicated. (Compl. at ¶ 16.) The policy describes that inmate suicide attempts are most likely to occur within the first 24 hours of incarceration or when an inmate suffers from withdrawal or intoxication and cites potential suicidal identifiers as narcotics and alcohol addiction. (Compl. at ¶ 17.) The policy further directs staff to "Watch Very Closely" narcotics addicts and alcoholics — the only notation of its kind. (Compl. at ¶ 17.)

Richmond City Sheriff's Office Policies and Procedures further provide that gas or chemicals cannot be administered against mentally ill inmates for non-cooperation, unless an imminent threat of bodily harm to themselves or others exists and such act would be the least forceful way to gain compliance. (Compl. at ¶ 22.) If a jail employee must use the O.C. spray, the policy requires that the inmate be decontaminated as soon as possible — even before medical personnel arrives — and that the inmate be monitored every 30 minutes for the next 24 hours by jail personnel. (Compl. at ¶ 22.) Plaintiff also alleges that the Jail maintains an official unwritten policy of "plac[ing] combative and/or intoxicated detainees immediately in a holding cell without taking any other precautions, without following the sanctioned Mental Health/Suicide Prevent Policy and other policies and procedures." (Compl. at ¶ 50.)

In Count I, Plaintiff alleges that Defendants Sink and Barnhouse deprived pretrial detainee Brunson of her Fourteenth Amendment rights, resulting in a cause of action under 42 U.S.C. § 1983. (Compl. at ¶¶ 32-47.) Plaintiff asserts that because the jail failed to administer a medical exam upon her arrival, failed to ask triage questions at intake, did not implement safety measures or monitoring in light of Brunson's cocaine ingestion and combative manner and used O.C. spray to gain compliance against a mentally ill inmate, Defendants Sink and Barnhouse disregarded the procedures and policies of the Richmond City Jail and were deliberately indifferent to Brunson's serious medical needs. (Compl. at ¶¶ 37–38, 40, 42.) Upon finding Brunson hanging in her cell after the suicide attempt, Plaintiff alleges that Defendants failed to support her body and neck while cutting her down from the bars. (Compl. at ¶ 44.) According to Plaintiff, such actions caused Brunson to suffer further brain damage and, as a result, Brunson remains in a permanent vegetative state, leaving her family to incur extensive medical bills. (Compl. at ¶¶ 45–47.)

Plaintiff alleges in Count II that Defendant Mitchell, while Sheriff for the City of Richmond, maintained a custom of housing combative and/or intoxicated arrestees in a holding cell immediately upon their arrival at the jail without taking other precautions. (Compl. at ¶¶ 48-50.) Such a policy, Plaintiff argues, indicates a deliberate indifference to Brunson's Fourteenth Amendment rights and caused or contributed to cause Brunson's injuries. (Compl. at ¶¶ 51.)

Furthermore, Plaintiff alleges in Count III that Defendant Mitchell failed to train jail personnel in violation of Brunson's Fourteenth Amendment rights by not instituting the proper procedures to tend to the needs of intoxicated or uncooperative arrestees. (Compl. at ¶¶ 53-55.) Plaintiff believes that Defendant Mitchell's failure constitutes deliberate indifference to Brunson's rights and caused Defendants Sink and Barnhouse, as well as other jail employees, to violate those rights. (Compl. at ¶¶ 56-57.)

Defendants move to dismiss under Rule 12(b)(6), alleging a failure to state a claim. (Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1.) They seek dismissal with prejudice, noting that the case was originally filed in 2006 and was dismissed without prejudice pursuant to an Order entered October 18, 2006. (3:06cv570; Compl. at Exhibit 1, 3.) Defendants argue that Plaintiff failed to sufficiently allege that Sink and Barnhouse violated Brunson's Fourteenth Amendment rights. (Def.'s Mot. at 3-6.) Defendants further contend that even if they violated Brunson's rights, Defendants Sink and Barnhouse are entitled to qualified immunity. (Def.'s Mot. at 6-8.) Regarding the claims against Defendant Mitchell in Counts II and III of the Complaint, Defendant Mitchell argues that Plaintiff has pleaded only "naked" and "conclusory" allegations unsupported by necessary factual allegations. (Def.'s Mot. at 8-9.) Defendant Mitchell further asserts that Count III is duplicative of Count II and, therefore, Count III should be dismissed for failing to allege an independent cause of action. (Def.'s Mot. at 8.)

## II. STANDARDS OF REVIEW

### A.    Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief about the speculative level," *id.* (citation omitted), to one that is "plausible on its face," rather than merely "conceivable." *Id.* at 570. In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Denial of Medical Care Claims

The due process rights of a pretrial detainee under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). "[W]hile the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee,

who has yet to be adjudicated guilty of any crime, may not be subjected to any form of 'punishment.'" *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (quoting *City of Revere*, 463 U.S. at 244). Pretrial detainees have a clearly established right to "medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992). To allege a valid denial of medical care claim, the plaintiff must first assert an "objectively, sufficiently serious" medical condition. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Second, the plaintiff must allege that the government official acted with a "sufficiently culpable state of mind." *Id.*

A government official acts with such a culpable state of mind when he is "deliberately indifferent to serious medical needs." *Gordon*, 971 F.2d at 1094 (citing *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir. 1978)). "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. It requires that "a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm." *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006). "Actual knowledge or awareness on the part of the [prison official] is essential to proof of deliberate indifference." *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our case law be condemned" as deliberately indifferent and therefore a violation of a prisoner's rights. *Farmer*, 511 U.S. at 838; *see also Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) ("A prison official is not liable if he 'knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'") (quoting *Farmer*, 511 U.S. at 844). In addition to actual

knowledge of the risk of harm, the prison official must also have "recognized that his actions were insufficient" to address the risk. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

## C.    Qualified Immunity

Qualified immunity protects government officials from civil lawsuits when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As such, it is "effectively lost if a case is erroneously permitted to go to trial." *Id.* This immunity "protect[s] government's ability to perform its traditional functions," *Wyatt v. Cole*, 504 U.S. 158, 167 (1992), by "avoid[ing] 'unwarranted timidity' in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 556 U.S. ___, ___, 132 S. Ct. 1657, 1665 (2012); *see also Short*, 436 F.3d at 426 (qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'") (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). Thus, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When evaluating a claim of qualified immunity, the Court must first "identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (*en banc*). Once the constitutional right is defined, a two-step inquiry determines whether an official enjoys qualified immunity. *Pearson v. Callahan*, 555

U.S. 223, 232 (2009); *Gregg v. Ham*, 678 F.3d 333, 338-39 (4th Cir. Apr. 30, 2012). "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. A court may address either inquiry first. *Id.* at 236. If the facts alleged do not establish that the official violated a constitutional right, then "there is no necessity for further inquiries concerning qualified immunity" and the official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Turmon v. Jordan*, 405 F.3d 202, 204-05 (4th Cir. 2005) (failure by Plaintiff to establish a constitutional violation "ends the matter and the officer is entitled to immunity") (quoting *Saucier*, 533 U.S. at 201).

"To be clearly established, a right must be sufficiently clear 'that every reasonable officer would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 556 U.S. ___, ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2078 (2011)) (alterations in original). Plaintiffs can establish that the right is clearly established if they can "point either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2086 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

## III. DISCUSSION

### A. Defendants Sink and Barnhouse

Plaintiff alleges that Sink and Barnhouse were deliberately indifferent to Brunson's medical needs in three ways: (1) by failing to follow jail policies and procedures designed to screen for suicidal tendencies and, thus, administering no protective measures or medical

attention after placing Brunson in the holding cell; (2) by spraying Brunson with O.C. and then failing to decontaminate her, thereby aggravating her "already decayed medical and mental states," (Compl. at ¶ 40.); and (3) by failing to support Brunson's head and body while cutting her down. (Compl. at ¶ 40-44.)

Defendants assert that they were not deliberately indifferent to Brunson's medical needs, because they had no actual knowledge of Brunson's suicide risk and any failure to follow the policies and procedures of the jail did not constitute deliberate indifference to Brunson's medical needs, since the policies exceed constitutional requirements. (Def.'s Mot. at 5.) They further argue that Sink's use of O.C. spray was reasonable and, therefore, not a violation of Brunson's constitutional rights. (Def.'s Mot. at 6-7.) Defendants also contend they were "the opposite of indifferent" when they cut Brunson down from the bars. (Def.'s Mot. at 7.) Finally, Defendants claim they are entitled to qualified immunity. (Def.'s Mot. at 5-8.)

"A substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by the first prong" of the *Farmer* analysis. *Brown v. Harris*, 240 F.3d 388, 389 (4th Cir. 2001). None of the allegations in the complaint, however, establish facts sufficient to show that either Defendant Sink or Defendant Barnhouse acted with deliberate indifference to Brunson's suicide risk.

1. **Defendants Sink and Barnhouse were not deliberately indifferent to Brunson's suicide risk when she arrived at the Jail Annex.**

Plaintiff initially alleges that Defendants Sink and Barnhouse acted with deliberate indifference by failing to follow the Jail Annex policies regarding inmate intake. But a violation of jail policies alone fails to provide a cause of action under 42 U.S.C. § 1983.[1] *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their

---

[1] Plaintiff stated that these policies, labeled Exhibits A through E in the Complaint, were attached to the Complaint. (Compl. at ¶¶ 36–43.) However, no such Exhibits were filed.

qualified immunity merely because their conduct violates some statutory or administrative provision."); *see also Smith v. Tolley*, 960 F. Supp. 977, 997 (E.D. Va. 1997) ("[T]he policies which [the officer] purportedly violated are standards that exceed, by far, anything required of him under federal or constitutional law. And, for that reason alone, any violation of those policies would not be actionable under Section 1983, which provides a remedy only for violations of federal or constitutional law."). "[A] failure to carry out established procedures, without more, does not constitute 'deliberate indifference for the possibility' that [the detainee] 'would take his own life.'" *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990) (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)). Indeed, Plaintiff concedes this point — as she must — and simply points to the alleged violation of policy as being "helpful in determining 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" (Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Mem") at 8) (citing *Saucier*, 533 U.S. at 202). Thus, Plaintiff's general allegation that Defendants Sink's and Barnhouse's failure to abide by jail policy cannot on its own support a cause of action under § 1983.

We next turn to Plaintiff's contention that Defendants Sink and Barnhouse were deliberately indifferent for failing to provide adequate medical care. The Fourth Circuit has held that "[t]here can be no claim against the officers for inadequate medical care when there exists no objective evidence that [the detainee] even has a serious need for such attention." *Belcher*, 898 F.2d at 35. More specifically, jail officials "need not screen a pretrial detainee for suicidal tendencies if they have no knowledge that the prisoner is suicidal." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992).

The Fourth Circuit's decision in *Belcher* guides our analysis here. In *Belcher*, the inmate committed suicide after being arrested for public intoxication and hazardous driving. 898 F.2d at 33. The inmate's father sued the jail officials, alleging that their failure to remove the inmate's belt and shoes, as well as failing to afford him the appropriate medical care, constituted a deliberate indifference to the inmate's medical needs. *Id.* at 33-34. In reversing the district court's denial of summary judgment, the Court held:

> The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies. There can be no claim against the officers for inadequate medical care when there exists no objective evidence that [the inmate] even had a serious need for such attention. . . . At no time did [the inmate] express any concern about his well-being or behave in a way that would have indicated to the officers that he posed a risk of suicide or that they should take any additional action.

*Id.* at 35 (internal citations omitted). The Court then concluded with words that resonate here:

> Plaintiff's theory of this case would result in an absolute right to be protected from committing suicide or from other sorts of harm while incarcerated, regardless of whether the officers had reason to know that such harm was likely to occur. The Eighth and Fourteenth Amendments do not contemplate liability upon the premise that all self-inflicted harm is someone else's fault.

*Id.* at 36. Thus, the issue becomes whether Defendants Sink and Barnhouse had a reason to know that Brunson was likely to commit suicide absent additional actions by the Defendants.

Plaintiff attempts to distinguish *Belcher* by saying that, unlike Brunson, *Belcher* was "in good spirits, singing, clapping his hands and humming." *Belcher*, 898 F.2d at 35. But, the courts have rejected efforts to hold jailers responsible for suicides by inmates like Brunson, who engaged in violent, non-compliant behavior within the jail when there has been no clear indication of a potential for suicide. For example, in *Camic*, the arrestee became violent towards officers during an arrest for a traffic offense. 712 F.2d at 1142-43. He was "obviously intoxicated," attempted to strike the arresting officer at the scene and became "abusive and

violent" towards the prison officials, kicking one of them and "generally resisting" while officers completed the booking process and transferred him to a cell. *Id.* The Seventh Circuit held that the officials' knowledge of these violent actions was not "synonymous with having reason to know that the violence might become self-directed." *Id.* at 1146. Therefore, the court refused to impose liability on the jailers resulting from the inmate's suicide.[2]

Likewise, in *Stiltner v. Crouse*, 327 F. Supp. 2d 667 (W.D. Va. 2004), the district court granted summary judgment on facts not dissimilar from those present here. The inmate in *Stiltner* ingested a prescription headache remedy, was arrested for driving under the influence of drugs and was then taken to a local county jail, where she apparently hung herself (if not killed by others). In granting summary judgment, the Court found "no evidence that the officers knew that [the inmate] was suffering from any psychological difficulty that would cause her to take her life." *Id.* at 670. Further, the inmate never requested "medical aid from the jail nurse who saw her initially." *Id.*

Several other courts have reached similar conclusions. *Gregoire v. Class*, 236 F.3d 413, 419 (3d Cir. 2000) (single call from inmate's wife indicating concern of suicide insufficient notice of inmate's intention to commit suicide); *Danese v. Asman*, 875 F.2d 1239, 1243-44 (6th Cir. 1989) (officers were entitled to qualified immunity when they had no knowledge that an intoxicated detainee was seriously contemplating suicide); *Estate of Cartwright v. City of Concord*, 856 F.2d 1437, 1438 (9th Cir. 1988) (inmate's joke about suicide failed to put jailers on sufficient notice of his suicidal intentions).

None of the allegations in the complaint establish facts sufficient to show that either Defendant Sink or Defendant Barnhouse had knowledge of, or even any particular reason to suspect, that Brunson presented such a substantial suicide risk. Defendants Sink and Barnhouse

---

[2]     Notably, the Fourth Circuit cited *Camic* with approval in *Belcher*, 898 F.2d at 35.

knew that Brunson had ingested cocaine, was uncooperative and had attempted to assault Stith. Knowing that Brunson was behaving violently, however, is not the same as knowledge or reason to believe such violence might lead to suicide. Moreover, Plaintiff has not alleged that Brunson expressed any concerns about her well-being to the Defendants or anyone else during the approximately 30 minutes that she was at the Jail Annex or that she behaved in a way that would indicate to the Defendants that she posed a substantial risk of *suicide*, rather than just a risk of violent behavior. Thus, Defendants Sink and Barnhouse had no actual knowledge that Brunson was a suicide risk or had any suicidal ideations and, therefore, were not deliberately indifferent to Brunson's serious medical needs as it relates to their actions.[3]

And even where the jail has knowledge of the suicidal intentions of an inmate, the Fourth Circuit has refused to impose liability on the jailer simply because the jailer "took less action than he could have, and by his own admission, should have." *Brown*, 240 F.3d at 390-91; *see also Short*, 436 F.3d at 427 ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.") (quoting *Farmer*, 511 U.S. at 835). In short, Plaintiff has failed to allege any acts or omissions by Defendant Sink and Barnhouse that demonstrate a deliberate indifference to Brunson's potential for suicide.

---

[3]     Defendants argue that even if they were aware of Brunson's suicide risk, "any measures beyond video surveillance are commendable but not required by the Constitution." (Def.'s Mot. at 5.) Because the Court finds that Defendants Sink and Barnhouse did not have actual knowledge of Brunson's suicidal tendencies, the Court need not address whether video surveillance is sufficient to show that the officers acted reasonably to address the risk.

2. **Defendants Sink and Barnhouse were not deliberately indifferent to Brunson's medical needs when they sprayed Brunson with O.C. spray and did not decontaminate her afterward.**

Defendants move to dismiss on the grounds that the use of O.C. spray is an excessive force claim and that Defendant Sink's actions were reasonable. (Def.'s Mot. at 6.) Plaintiff maintains that by using O.C. spray on Brunson and failing to decontaminate her immediately afterwards, Defendants Sink and Barnhouse were deliberately indifferent to Brunson's Fourteenth Amendment rights. (Compl. at ¶¶ 40-41; Pl. Mem. in Opp. at 9-10.) Plaintiff asserts that Defendants' actions were against the jail's policy regarding the use of gas or chemical agents against mentally ill inmates, which forbids the use of such chemicals against a mentally ill inmate "**UNLESS** they pose an imminent threat of bodily harm to themselves or others and this would be the least amount of force necessary to bring this type of inmate under control" and that the inmate be decontaminated as soon as possible. (Compl. at ¶ 22, 40-41) (emphasis in original).

Construing Plaintiff's claim as a Fourteenth Amendment claim for deliberate indifference,[4] the Court finds that Defendants Sink and Barnhouse were not deliberately indifferent to Brunson's constitutional rights. In *Young v. City of Mount Ranier*, 238 F.3d 567, 576 (4th Cir. 2001), the arrestee, who was under the influence of phencyclidine ("PCP"), died after arresting officers used pepper spray to subdue him. The Court found that the officers, who did not know that Young was under the influence of PCP, were not deliberately indifferent. *Id.* at 576-77. "[T]he complaint simply establishe[d] that Young struggled with law enforcement officers, was sprayed with pepper spray, restrained, transported to a hospital in a prone position,

---

[4] Plaintiff alleged in the complaint that Defendant Sink's actions were deliberately indifferent to Brunson's medical needs, not that Defendant Sink used excessive force by spraying her with O.C. spray. As such, the Court construes the pleading as the Plaintiff has alleged.

and died sometime thereafter." *Id.* at 577. Those facts were not sufficient to establish that the officers knew of and disregarded a substantial risk of harm to the arrestee. *Id.*

Like *Young*, Plaintiff has failed to allege that Defendants Sink and Barnhouse were deliberately indifferent to Brunson's rights. As discussed above, Defendant Sink did not know or have reason to believe that Brunson was suicidal or in an "already decayed . . . mental state[]," (Compl. at ¶ 40.), when he sprayed Brunson with the O.C. spray. Furthermore, Plaintiff has admitted that Brunson was non-compliant while she was detained. Brunson "resist[ed] and was combative" with jail personnel while they took her to her cell and refused to comply with orders when they attempted to remove her handcuffs. (Compl. at ¶¶ 18-20.) Moreover, the Complaint fails to allege that the use of the O.C. spray was unnecessary or excessive in its amount. (Compl. at ¶¶ 40-41.)[5]

Plaintiff has also not alleged that Brunson exhibited any adverse reactions as a result of the O.C. spray or the lack of decontamination. In her Complaint, Plaintiff simply stated that "Brunson complied and the handcuffs were removed" after Sink sprayed her with the O.C. (Compl. at ¶ 23.) Defendants Sink and Barnhouse had no knowledge, or even any reason to know, that the O.C. spray had aggravated Brunson's suicidal ideations. Similarly, the Complaint fails to identify any harm caused by the lack of decontamination of this single application of O.C. spray.

Plaintiff's Complaint has established that Brunson was combative and non-compliant with officers, who then sprayed her with a one-second blast of O.C. spray to gain her compliance. Once she complied, they removed her handcuffs and left her in her cell with no alleged adverse reactions to the spray. Sometime later, Brunson attempted suicide. These facts

---

[5]    This case is a far cry of that in *Iko v. Shreve*, 535 F.3d 225, 239-40 (4th Cir. 2008), where the court found that the guard used excessive force by spraying the inmate several times even after the inmate complied with the guard's instructions.

are not sufficient to establish that Defendants Sink and Barnhouse, without any knowledge of her suicidal tendencies, were deliberately indifferent to Brunson's constitutional rights.

### 3. Defendants Sink and Barnhouse were not deliberately indifferent to Brunson's medical needs after her attempted suicide.

Plaintiff asserts that Defendants Sink and Barnhouse were deliberately indifferent to Brunson's medical needs when they failed to support her body and/or neck when Felthoff cut her shirt. (Compl. at ¶¶ 26, 44.) According to Plaintiff, as a result of this deliberate indifference, Brunson slid down the bars of the cell and forcibly struck her head on the bars of the cell door, adding to her injuries. (Compl. at ¶ 44.) Defendants argue that no case law exists to support this claim and, therefore, they are entitled to qualified immunity. (Def.'s Mot. at 7.)

The jail officials, including Defendants Sink and Barnhouse, faced an emergency situation in which an inmate tried to hang herself from the bars of her cell. They attempted to end the suicide attempt quickly by cutting Brunson's shirt, calling 911 and performing rescue breathing until EMS arrived approximately six minutes later. (Compl. at ¶¶ 26-28.) Nowhere in the Complaint does Plaintiff allege that Defendants Sink and Barnhouse acted with any purpose other than trying to save Brunson's life.

Those who serve the government, and particularly jail officials facing an emergency situation such as this, need to act "with the decisiveness and the judgment required by the public good." *Scheurer v. Rhodes*, 416 U.S. 232, 240 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Indeed, the very purpose of qualified immunity is to prevent "'unwarranted timidity' on the part of those engaged in the public's business." *Filarsky*, 566 U.S. at ___, 132 S. Ct. at 1665 (quoting *Richardson v. McKnight*, 521 U.S. 399, 409 (1997)). Defendants Sink and Barnhouse needed to act quickly and decisively to save an inmate's life. Qualified immunity ensures that the fear of a lawsuit will not cloud their judgment, nor temper

18

their efforts to act for the public good. *See id.* at 1666. Thus, Defendants Sink's and Barnhouse's actions were not only reasonable in this situation, but laudable, and they were certainly not deliberately indifferent to Brunson's medical needs when they acted to quickly cut her shirt from the bars. *See Brumfield v. Hollins*, 551 F.3d 322, 332-33 (5th Cir. 2008) (failure of guards to employ life-saving techniques to inmate found hanging by his shoestring, although "arguably negligent . . . did not amount to deliberate indifference.").

Even if, however, Plaintiff has established that Sink and Barnhouse were deliberately indifferent by failing to support her body and/or neck, Sink and Barnhouse are entitled to qualified immunity on this allegation. The right violated by the officers must be "clearly established" at the time of the violation. *Pearson,* 555 U.S. at 232. While qualified immunity is not guaranteed if no controlling authority exists holding that conduct identical to the defendant's is unlawful, *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir. 2001), the unlawful nature of the official's conduct must only be reasonably and objectively apparent. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Here, there can be no question that Defendants acted reasonably to save Brunson's life.

Further, as Plaintiff effectively concedes, there is no guidance from any court that would indicate to Defendants Sink and Barnhouse that they needed to support Brunson's body and neck to prevent her head from hitting the cell door while Deputy Felthoff cut Brunson's shirt during an attempted suicide. (*See* Pl.'s Mem. at 10.) Plaintiff has further failed to cite to any authority in any jurisdiction that holds that Defendants Sink's and Barnhouse's actions, or substantially similar actions, were unlawful. (*See* Pl.'s Mem. at 10-11.) Although "officials can still be on notice that their conduct violates established law even in novel factual circumstances," (Pl.'s Mem. at 10) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks

19

omitted)), the inquiry focuses on whether the law as it stood at the time of the alleged constitutional violation gave the officials "fair warning" that their actions were unlawful. *Hope*, 536 U.S. at 741. A reasonable officer facing this situation would not have had "fair warning" that failing to support the person's head and neck while trying to save an inmate's life was unlawful. *See al-Kidd*, 131 S. Ct. at 2083 (a clearly established right must be sufficiently clear such that "every reasonable officer would have understood that what he is doing violates that right.") (internal quotation marks and citation omitted). Therefore, the Court recommends that Count I be dismissed against Defendants for this reason as well.

**B.     Defendant Mitchell**

Plaintiff asserts two claims against Defendant Mitchell (the former Sheriff for the City of Richmond) in the Complaint. In Count II, Plaintiff alleges that Mitchell had an official policy or custom of:

> placing combative and/or intoxicated detainees immediately in a holding cell without taking any other precautions, without following the sanctioned Mental Health/Suicide Prevent Policy and other policies and procedures, and/or otherwise operating and maintaining the Jail Annex in a way that resulted in the complete disregard of and deliberate indifference to Brunson's safety and medical needs, and Brunson's readily apparent medical condition.

(Compl. at ¶ 50.) In Count III, Plaintiff further complains that Mitchell failed to train the jail personnel to ensure that they could adequately respond to the "readily foreseeable medical needs of combative and/or intoxicated detainees." (Compl. at ¶ 54.) This Court has previously held that the latter claim duplicates a claim alleging a "policy of deliberate indifference to detainees' medical needs." *Newbrough v. Piedmont Regional Jail Authority*, 822 F. Supp.2d 558, 583 (E.D. Va. 2011) (J. Hudson) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Thus, Count III must be dismissed as an independent claim and the allegations contained therein must be viewed in conjunction with the allegations set forth in Count II. *Id.* at 583.

Turning to Count II, we must answer whether Defendant Mitchell may be held liable for her policy for the handling of combative and/or intoxicated detainees during her tenure as Sheriff. Supervisory officials are not held liable for the constitutional injuries of their subordinates under a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Instead, supervisors may only be liable if their "edicts or acts may fairly be said to represent official policy" or custom. *Id.* at 694.

To state a claim against a supervisor for his employee's misconduct, a plaintiff must plead facts sufficient to plausibly show that: (1) a constitutional injury occurred as a result of the employee's conduct, (2) the supervisor had a policy or custom that amounted to a deliberate indifference to the deprivation of constitutional rights, and (3) this policy or custom caused the constitutional injury complained of. *Canton*, 489 U.S. at 388-92. A policy can be established by "written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). A custom "may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Id.* (quoting *Monell*, 436 U.S. at 691). The policy must reflect "deliberate indifference that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997). "The challenged policy cannot merely be the abstract one of violating citizens' constitutional rights." *Carter*, 164 F.3d at 218.

A supervisor cannot be held liable absent a constitutional violation by the people she supervised. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) ("[The City was] sued only because

they were thought legally responsible for [the police officer's] actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent."); *see also Young*, 238 F.3d at 579 ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."). And even if Plaintiff alleges a constitutional violation, the Plaintiff must demonstrate that "the alleged training [or policy] deficiency . . . was the 'moving force'" that caused the complained of injury." *Connick v. Thompson*, 131 S. Ct. 1350, 1358 n. 5 (2011) (quoting *Canton*, 489 U.S. at 389).

A failure to properly train employees may serve as the basis for liability when such failure amounts to deliberate indifference to the constitutional rights of persons coming into contact with those employees. *Canton*, 489 U.S. at 388-89. The Supreme Court in *Thompson* recently set forth the rigid standards that must be met to establish such a claim:

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

131 S. Ct. at 1360 (internal citations and quotation marks omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at

1360 (quoting *Bryan City*, 520 U.S. at 409). Only in the rarest of circumstances may "the unconstitutional consequences of failing to train . . . be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 1362. As the Court in *Canton* pointed out:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

489 U.S. at 391.

The allegations against Defendant Mitchell fail to meet these demands. As previously detailed, no constitutional violation occurred, because Defendant Mitchell's employees (Sink and Barnhouse) lacked sufficient notice of Brunson's suicidal ideations. And the Complaint fails to allege a pattern of unconstitutional violations that resulted in suicides or attempted suicides. Further, even if such a constitutional violation had occurred for which Defendant Mitchell had notice (actual or constructive), the Complaint fails to allege the requisite causal link between Defendant Mitchell's policies and Brunson's attempted suicide. Therefore, the claims against Defendant Mitchell must be dismissed.

## IV. CONCLUSION

In conclusion, and for the reasons discussed herein, it is the recommendation of this Court that the Defendants' motion to dismiss (ECF No. 3) be GRANTED and the case be DISMISSED with prejudice.[6]

---

[6] Because the case was originally filed in 2006 and dismissed without prejudice, this is Plaintiff's second, unsuccessful attempt at pleading a plausible claim. (Compl. at Exhibit 1, 3.)

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Henry E. Hudson with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ _____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  December 14, 2012